**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| MATTHEW MOORE, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ASSOCIATED NEWSPAPERS LTD. and MAIL MEDIA, INC.,<br><br>Defendants. | Case No. 1:26-cv-5536<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Matthew Moore ("Moore" or "Plaintiff"), individually and on behalf of all others similarly situated, by and through his undersigned counsel, brings this Class Action Complaint against Defendants Associated Newspapers Ltd. and Mail Media, Inc. (together, "Defendants" or the "Daily Mail"), and alleges as follows upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters based on the investigation of counsel:

## I.    NATURE OF THE ACTION

1.    The Daily Mail is one of the most-read English-language news publishers in the world. It has built that readership, in part, on photographs it does not own, did not license, and did not pay for. The business runs on volume. It publishes thousands of articles, draws enormous web traffic, and sells advertising against that traffic. To feed it, the Daily Mail takes photographs that ordinary people create and post to their own social media accounts, copies them onto its own servers, and republishes them to illustrate its articles. It does so without a license, without payment, and without credit to the person who made the image.

2.    Some portion of what the Daily Mail publishes is wire and stock photography, licensed and properly credited. That is no accident. The wire services and stock agencies that own

those photographs are sophisticated, well-funded enterprises that guard their copyrights and sue to enforce them. This case is about the rest. The Daily Mail clears no rights before publishing photographs lifted from an individual's social media account. It publishes first and pays only if caught—wagering that the people it takes from will never learn their work was used and could not afford to pursue it if they did. The wager has held. The overwhelming majority never find out, and the rare creator who does is quietly paid while the practice continues.

3.  The wager pays only if the taking stays hidden, and the Daily Mail makes sure it does. As a templated step in its production process, it stamps a false credit onto the face of the copied image—"© instagram"—naming a platform that it knows, per the platform's terms of service, owns nothing, in the spot accurate copyright-management information ("CMI") belongs. The same articles that carry "© instagram" over a copied photograph also carry "© Getty Images" and "© AP" over the photographs the Daily Mail has licensed. In the Daily Mail's own publishing grammar, that is where ownership is identified. "© instagram," however, declares an owner the Daily Mail knows to be false.

4.  The false credit is what makes the copying work: it forecloses every avenue by which the taking might be challenged. The reader and advertiser see a credited photograph, assume it is licensed, and look no further. The photographer—the one person with reason to object—has his name replaced by a platform's, so the name-searches and credit alerts that working artists employ to detect unauthorized uses return nothing, and the demand for payment never comes. And the Daily Mail's own role disappears: an image stamped "© instagram" reads as someone else's licensed photograph, not as a copy the Daily Mail made and published without permission. In each instance the result is the same—the taking goes unchallenged, and the licensing fee the Daily Mail would otherwise owe never comes due. This is false CMI within the meaning of 17 U.S.C.

2

§ 1202(c), applied as a uniform editorial practice with the intent to enable, facilitate, and conceal the Daily Mail's infringement.

5.      What the Daily Mail did to Matthew Moore is that practice, run once. Moore, a working artist, created an original photographic portrait and gave its subject a single copy. The subject later posted the photograph to her own Instagram account, and the Daily Mail copied it from there—re-hosting it on its own servers and publishing it in a December 24, 2025 article on its site. It stamped "© instagram" on the image, captioned only the subject, and named Moore nowhere—not in the credit, not in the caption, not on the page. The Daily Mail held no license and paid Moore nothing. Moore learned of the use only by chance, when the photograph's subject came across the article and sent it to him. The concealment did exactly what it was built to do; it failed here only by accident.

6.      Moore is one of many. In a single nine-day window this month, counsel reviewed the Daily Mail's United States edition by hand and found 107 articles that published a photograph—often more than one—taken from social media and bearing a false "© [platform]" credit. *See* Exhibit 1. At $2,500 to $25,000 per violation of the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 1203(c)(3)(B), that nine-day, hand-counted sample already exposes the Daily Mail to more than ten million dollars per year in liability at the DMCA statutory floor alone. Across the applicable limitations period, and with infringement damages added, the Daily Mail faces tens of millions of dollars in liability even before any enhancement for willfulness. The practice is templated, continuous, and years old, and it has swept up thousands of works.

7.      The Daily Mail has counted on never answering for this, and the law has given it cover. The natural remedy—a suit for infringement under 17 U.S.C. §§ 106 and 501—is one the Copyright Act keeps beyond the ordinary creator's reach. To recover the statutory damages and

3

fees that make a suit worth bringing on facts like these, the creator ordinarily must have registered the work before the infringement began, or within three months of the work's first publication; absent that, § 412 denies both remedies—and the ordinary people posting to Instagram almost never register at all. The Daily Mail takes from precisely those creators—the unregistered many, not the professional few—and the false credit ensures creators rarely learn of the taking in the first place. That is why the practice is profitable, and why it has gone largely unanswered.

8.    Plaintiff brings this action to answer the practice at the scale on which it runs: for himself and a nationwide Class of creators whose photographs the Daily Mail copied from a social media source, re-hosted on its own servers, and displayed to readers in the United States. The Class proceeds through two Subclasses, each defined by objective facts visible on the face of Defendants' own publications and reflected in their records: a False-CMI Subclass under 17 U.S.C. § 1202(a), of creators whose republished photographs bore one of an enumerated set of "© [platform]" credits—"© instagram" chief among them—on a page that named no author or copyright owner; and a Registered Infringement Subclass under 17 U.S.C. §§ 106 and 501, of creators who hold a U.S. copyright registration for the work at issue.

9.    For the False-CMI Subclass, Plaintiff seeks the DMCA's per-violation statutory damages, or, at the Subclass's election, actual damages and the Daily Mail's profits; for the Registered Infringement Subclass, Plaintiff seeks the remedies available under 17 U.S.C. §§ 504 and 505. Plaintiff also seeks a declaration that the practice violates the Copyright Act and the DMCA, and a narrow injunction reaching the practice and the Daily Mail's handling of CMI. What the Daily Mail did to Moore it has done to thousands. It is standard practice, and Moore brings this action to end it.

## II.    PARTIES

10.    Plaintiff Matthew Moore is an individual residing in the State of California. Moore is the sole author of, and owns all copyright in, the photographic portrait at issue (the "Work"), as further described below. Moore is a member of, and the proposed representative of, the False-CMI Subclass and the Registered Infringement Subclass.

11.    Defendant Mail Media, Inc. ("Mail Media") is a corporation organized under the laws of the State of Delaware. Mail Media maintains its principal place of business in New York, New York. Mail Media operates the United States edition of the Daily Mail's website, dailymail.com (also known as "MailOnline"), and maintains a newsroom in this District. Mail Media employs the U.S. editorial staff who produce the U.S. edition from that New York newsroom; publishes and serves the U.S. edition's articles and images, including the Article described in Section IV below, to readers throughout the U.S.; and sells advertising against that traffic.

12.    Defendant Associated Newspapers Ltd. ("ANL") is a company organized under the laws of England and Wales, with a registered office at Northcliffe House, 9 Derry Street, Kensington, London W8 5HY, United Kingdom. ANL publishes the Daily Mail and owns and operates the Daily Mail's print and digital properties, including dailymail.com. ANL and Mail Media share common ultimate ownership through the DMGT/dmg media corporate family and have overlapping officers; ANL owns, operates, or controls the common content-management and picture-desk systems through which both the U.K. and U.S. editions are produced, including the system that applies image credits to published photographs; ANL sets and enforces the editorial, rights-clearance, and crediting policies that govern the U.S. edition; and ANL derives substantial revenue from U.S. readership and from advertising sold against that traffic. Each Defendant

participated in the reproduction, re-hosting, public display, and crediting of the Work and of the works of the Class. ANL and Mail Media acted in concert with respect to the conduct alleged herein. In the alternative, each performed the acts alleged jointly, or each is liable for the acts of the other as its principal, agent, joint venturer, or as its alter ego whose separate corporate form, if any, should be disregarded under the doctrine of piercing the corporate veil.

### III. JURISDICTION AND VENUE

13. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a) because this action arises under the Copyright Act, 17 U.S.C. § 101 *et seq.*, and the CMI provisions of the DMCA, 17 U.S.C. § 1202.

14. The registration requirement of 17 U.S.C. § 411(a) is a precondition to filing a copyright infringement claim, not a limit on this Court's subject-matter jurisdiction. *See Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 157 (2010) ("Section 411(a)'s registration requirement is a precondition to filing a claim that does not restrict a federal court's subject-matter jurisdiction."). Accordingly, this Court has subject-matter jurisdiction to adjudicate the claims of Class members under 17 U.S.C. § 1202—claims that carry no registration precondition—regardless of whether those members have registered their works.

15. This Court additionally has jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), (d)(5)(B), and (d)(6), because the matter in controversy exceeds $5,000,000 exclusive of interest and costs, the proposed Class consists of more than 100 members, and at least one member of the Class is a citizen of a State different from at least one Defendant, including because Moore is a citizen of the State of California and ANL is a citizen or subject of a foreign state. The amount in controversy is satisfied by the per-violation statutory damages of $2,500 to

$25,000 under 17 U.S.C. § 1203(c)(3)(B) sought for the false "© [platform]" credit instances collected in Exhibit 1; Defendants' practice encompasses many thousands of works.

16.     Each Defendant is subject to personal jurisdiction in this District on the strength of its own contacts. Mail Media maintains its principal place of business in New York, New York; it is therefore "essentially at home" in New York and subject to general personal jurisdiction here on any claim. This Court independently has specific personal jurisdiction over Mail Media because the claims in this action arise directly from Mail Media's own conduct in New York, namely, its publication, from a newsroom in this District, of the U.S. edition of dailymail.com, which is the edition in which the Work and the works of Class members were reproduced, re-hosted, publicly displayed, and falsely credited, including in the Article described in Section IV below.

17.     This Court has specific personal jurisdiction over ANL on the basis of ANL's own suit-related conduct. ANL transacts business in New York, in person and through its agent and/or alter ego Mail Media, which publishes the U.S. edition of dailymail.com from New York under ANL's editorial and operational control and for ANL's benefit, using content-management and crediting systems that ANL owns, operates, or controls; and the claims in this action arise from those very publications. Under N.Y. C.P.L.R. § 302(a)(1), a single purposeful New York transaction bearing a substantial relationship to the claim suffices, even for a defendant that never enters New York. Here, every element of the causes of action bears a New York nexus: each reproduction, each re-hosted copy, each false credit, and each public display alleged in this Complaint was accomplished through the New York-operated U.S. edition, and ANL's deliberate, repeated use of that New York operation as the instrument of the wrongs alleged is purposeful availment consistent with due process. ANL has continuously and deliberately exploited the New York and U.S. market for its publications and derives substantial advertising revenue from doing

so; it must therefore reasonably anticipate being haled into court in this District in an action based on the contents of those publications.

18.     To the extent ANL contends it is not subject to personal jurisdiction in New York or in any other single state, this Court has personal jurisdiction over ANL under Federal Rule of Civil Procedure 4(k)(2). Plaintiff's claims arise under federal law, and ANL's contacts with the U.S. as a whole, alleged above, make a U.S. forum foreseeable and the exercise of jurisdiction consistent with due process.

19.     The center of gravity of this action is domestic. The U.S. edition of dailymail.com is produced by a newsroom in New York. The works at issue were displayed and distributed to U.S. readers. The claims arise exclusively under U.S. statutes—the Copyright Act and the DMCA—regulating that domestic display and distribution. The Class, as defined below, comprises only persons in the U.S., and the copyright registrations on which the Registered Infringement Subclass depends are U.S. registrations. No foreign forum adjudicates U.S. copyright and DMCA claims.

20.     Venue is proper in this District under 28 U.S.C. §§ 1391(b) and (c) and 28 U.S.C. § 1400(a), because Defendants reside in and/or may be found in this District, a substantial part of the events giving rise to the claims occurred in this District, and Defendants are subject to personal jurisdiction here.

### IV.     FACTUAL ALLEGATIONS

**A.   Moore Created the Work and Has at All Times Been Its Sole Owner.**

21.     Plaintiff Matthew Moore, an artist and producer, created the Work—an original photographic portrait of the actress Annie Sertich. Moore conceived, composed, shot, and selected

it. The Work is an original work of authorship, fixed in a tangible medium of expression, and copyrightable subject matter under 17 U.S.C. § 102.

22.    Moore is, and has at all relevant times been, the sole author and copyright owner of the Work, holding the exclusive rights to reproduce, distribute, and publicly display it under 17 U.S.C. § 106.

23.    Moore retained ownership of the copyright. He did not sell, assign, license, or otherwise transfer any right, title, or interest in the copyright to Defendants, to any wire service or agency, or to any other publisher. Defendants received no license or authorization from Moore to reproduce, re-host, distribute, or publicly display the Work.

24.    On or about December 15, 2025, Ms. Sertich posted the Work to her personal Instagram account as one image within a multi-image "carousel" post. A true and correct screenshot of the post, captured by counsel on June 25, 2026, is attached as Exhibit 2.

25.    Ms. Sertich is the subject of the Work, not its author, and no act of posting the Work to social media granted Defendants any license to copy, re-host, or republish it.

**B.    The Daily Mail Copied the Work, Re-hosted It, Stamped It "© instagram," and Distributed and Publicly Displayed It.**

26.    On or about December 24, 2025, Defendants published an article on dailymail.com concerning the "VHS Dates" comedy video series (the "Article").[1]

27.    For the Article, Defendants reproduced the Work, stored and re-hosted a copy of it on their own servers, and distributed and publicly displayed it, including through a "View gallery" feature presenting multiple photographs. Defendants did not embed, frame, or in-line link to an

---

[1] A true and correct copy of the Article, as captured on June 25, 2026 and preserved by counsel at https://archive.is/iyDjw, is attached as Exhibit 3. The copy attached has been excerpted to remove extraneous material—advertisements, unrelated article links, and other page furniture not part of the Article—and is otherwise a complete and accurate reproduction of the Article as originally published.

image hosted by Instagram or any third party; they made their own copy and served it to the public from their own infrastructure. They published the Work as a standalone image—not a screenshot or embed of Ms. Sertich's post, but the photograph itself, stripped of the post's frame, caption, and interface—to illustrate an article about VHS Dates, not about the post.

28. The published copy bore the credit "© instagram," stamped onto the face of the image. The caption beside it named only the photograph's subject, Ms. Sertich. Nothing Defendants published—not the credit, not the caption, not any text on the page—named Moore.

29. Defendants did not contact Ms. Sertich to ask permission to use the Work or to learn who created it. They sought no license from Moore, credited him nowhere, and paid him nothing. Defendants' use was commercial: the Work illustrated, decorated, and drew readers to the Article and the advertising sold alongside it.

30. Defendants copied the entire Work, unaltered, and put it to the same purpose the Work itself serves—depicting its subject. They added no commentary, criticism, or reporting on the photograph; the Article says nothing of the Work, its creation, or its creator. The copy supplied, for free, the very use for which such a photograph is licensed.

**C. The "© instagram" Credit Is False CMI.**

31. The "© instagram" credit that Defendants stamped on and published with the Work is CMI within the meaning of 17 U.S.C. § 1202(c): a copyright notice, and information purporting to identify the copyright owner, conveyed by Defendants with a copy of the Work.

32. It is false. Instagram does not own the copyright in the Work, has never owned it, and its terms expressly disclaim owning it—a fact Defendants know, or are at least willfully blind to, as sophisticated managers of intellectual property and among the heaviest commercial users of platforms like Instagram. Moore owns the copyright in the Work. By stamping "© instagram" on the Work and publishing it, Defendants falsely represented to the public the Work's owner.

33.    Nor was the false credit an accident of the page. It is applied through the standing mechanism by which Defendants credit nearly every editorial image: a picture editor selects the credit for each image in the credit field of Defendants' content-management system, and Defendants' production process renders that credit into the published image's pixels. That the credit is deliberate is plain from Defendants' own publishing grammar: on the same pages, Defendants render genuine licensor credits in the identical "© [name]" format—"© Getty Images," "© AP"—so within their own system, the © field is where ownership is asserted. And that it is false is equally plain: Instagram's terms of service provide that users keep ownership of what they post, a fact basic to any picture desk. The "© instagram" credit is thus Defendants' template working as designed—stamped knowing it was false, and with the intent to enable, facilitate, and conceal infringement, including Defendants' own unauthorized reproduction and public display of the Work, by presenting the copied image to the public as sourced and cleared.

**D.    Moore Registered the Work.**

34.    Moore registered the Work with the United States Copyright Office, Registration No. VA0002489101, effective December 31, 2025. A true and correct copy of the certificate is attached as Exhibit 4.

35.    That registration satisfies the precondition to a civil action for infringement under 17 U.S.C. § 411(a).

36.    Moore's claim under 17 U.S.C. § 1202 needs no registration at all: by its terms, § 412 limits only the statutory damages and fees available under §§ 504 and 505 for infringement, leaving untouched the separate remedies § 1203 provides for a violation of § 1202.

37.    The sequence is this: Moore gave Ms. Sertich one copy of the Work; she posted it to Instagram on or about December 15, 2025; Defendants copied and published it on or about

December 24, 2025; Moore's registration took effect on December 31, 2025; Defendants then continued to reproduce, re-host, distribute, and publicly display the Work with the false credit through at least March 17, 2026.

### E.    What the Daily Mail Did to Moore, It Does by System.

38.    The taking of Moore's Work was no isolated lapse. As corroborated by counsel's hand review described below and the verified exemplars in Exhibit 1, it reflects a uniform, centralized, and ongoing business practice. Defendants build and monetize their high-traffic, advertising-driven news platforms, in part, on the systematic and unpaid taking of photographs that ordinary people create and post to their own social media accounts.

39.    Defendants routinely (a) harvest photographs from individuals' social media accounts; (b) reproduce, re-host, and store copies on their own servers; (c) publicly display those copies in their articles and image galleries; and (d) neither license the photographs nor pay the people who own them. For the U.S. edition, dailymail.com, this runs through Defendants' New York newsroom, the copies are served from infrastructure reaching U.S. readers, and the distribution and display at issue here occurred in the U.S.

40.    Defendants' false crediting is standardized too. Defendants stamp a false or generic platform credit—"© instagram" or "© [platform]"—onto the copied photograph in place of the author or owner's own CMI; or, in a variant not presently pleaded as a claim in this action, but probative of Defendants' knowledge, intent, and willfulness, they publish the photograph with no credit to the author at all.[2] Either way, the caption or adjacent text names, at most, the photograph's

---

[2] Counsel's investigation has also identified instances in which Defendants republished copied photographs stripped of author-identifying CMI that was present at the source—conduct that would be actionable under 17 U.S.C. § 1202(b). At this time, Plaintiff does not assert a § 1202(b) claim or seek to represent a corresponding subclass in this Complaint, and references this conduct

subject, but not the work's author or owner.

41.    The practice is deliberate in design and automatic in application—a templated step in Defendants' production process, not a photograph-by-photograph judgment. The credit is neither a caption nor metadata: Defendants' production process burns it into the image's pixels on a page that carries no separate credit field naming any author. The burned credit is itself proof that the source data exists in Defendants' systems because a process that stamps "© instagram" on a templated basis necessarily receives each image's platform source as structured data at ingestion. Defendants' pipeline also keeps each image as downloaded—before cropping and before the credit is burned in—so each source photograph can be compared against the published copy from Defendants' own records.

42.    For photographs taken from individuals' social media accounts—as opposed to images licensed from wire services, stock agencies, or licensing intermediaries—Defendants clear no rights before publishing. They publish first and pay only in the rare case where a copyright owner discovers the use and demands payment, externalizing the cost and labor of rights clearance onto the very creators whose photographs fill Defendants' pages and draw Defendants' advertising revenue.

43.    Counsel's pre-suit investigation confirms the practice, its uniformity, and its scale. Counsel reviewed and verified, by hand, recent articles published on Defendants' U.S. edition at dailymail.com across a nine-day window in June 2026—a review probative of both editions because dailymail.com and dailymail.co.uk share a common content-management and image-

solely insofar as it bears on Defendants' knowledge, intent, and willfulness as to the claims asserted herein. Plaintiff reserves the right to seek leave to amend.

hosting system and cross-publish content, and Defendants' own publication of Moore's Work on dailymail.com bore the same templated platform credit.

44. That review surfaced the same pattern, again and again: a photograph taken from an individual's social media account, published under nothing but a bare platform credit (such as "© instagram"), a bare account handle, or no credit at all—and with no author named in the published text.

45. Exhibit 1, attached and incorporated here, collects a representative, hand-verified set of exemplars, each an instance in which Defendants published a copied photograph under a false platform credit such as "© instagram." The set is illustrative, not exhaustive: a small, hand-counted sample of a practice that has swept up many thousands of photographs and creators.

46. As Exhibit 1 and the credit on Moore's own Work both show, Defendants' stamping of a false platform credit—in the author's place, whether or not the source copy carried the author's name—is a single, templated, affirmative editorial act applied in like manner across the photographs Defendants take from social media.

47. No social media platform's terms of service granted Defendants a license to reproduce, download, re-host, or commercially republish photographs its users post. Whatever license a user's posting creates runs to the platform, not to Defendants; and to the extent any platform's terms reach beyond the platform at all, they reach only platform features such as embedding, which Defendants did not use. Defendants instead made their own copies and served them to the public from their own infrastructure. Moore's case illustrates the point: the Work reached Defendants not through any license, but through Defendants' own copying, which no platform's terms and no act of posting authorized.

48.    Defendants have long known that this conduct is actionable because they have been sued for it repeatedly across more than fifteen years, and not one suit changed a thing. The first came in 2010, when a photo agency brought a federal copyright action against ANL over its use of photographs. Complaint at 4-8, *Mavrix Photo, Inc. v. Daily Mail of London (Associated Newspapers Ltd.)*, No. 2:10-cv-09045 (C.D. Cal. filed Nov. 23, 2010) (docket identifying the defendant as "Associated Newspaper Ltd erroneously sued as Daily Mail of London"). ANL appeared and settled, dismissing the action by stipulation in March 2012. The clearest warning came next, and from this very courthouse. In *Devocean Jewelry LLC v. Associated Newspapers Limited*, No. 16-CV-2150 (KMW), 2016 WL 6135662, at *2 (S.D.N.Y. Oct. 19, 2016), a creator alleged that ANL had published the creator's video and screen-grabs from it on Daily Mail Online with the creator's identifying logo stripped away. The court denied ANL's motion to dismiss, holding that the creator had adequately pleaded both the removal of CMI and the intent 17 U.S.C. § 1202 requires. ANL has thus known since October 2016—from a court in this District, under the same statute Moore now invokes—that author-identifying material on content taken from a creator is CMI, and that publishing the content with that information stripped away violates § 1202.

49.    ANL did not stop. Three years later, the exclusive licensee of online video content sued the Daily Mail's corporate parent for willful copyright infringement, alleging in detail the very model this Complaint describes: that the Daily Mail takes the content it wants without clearing rights, and pays only when a rights-holder discovers the use and demands payment. *Rumble, Inc. v. The Daily Mail and General Trust PLC*, 459 F. Supp. 3d 1294, 1297 (C.D. Cal. 2020). That suit followed an earlier one by the same plaintiff over more than fifty infringed videos, which had settled; this one settled too, in March 2021. Between these suits and since, Defendants have fielded repeated infringement claims and payment demands over photographs taken from individuals'

15

social media accounts. The response never varied: Defendants settled the case in front of them, paid the creator who had caught them, and left the practice running—long enough to reach Moore in December 2025, and beyond.

50.    Plaintiff pleads this litigation history as a matter of public record subject to judicial notice, bearing directly on Defendants' knowledge and intent under 17 U.S.C. § 1202 and on the willfulness of the infringement alleged under § 504(c)(2).

## V.    INJURIES

### A.    Moore's Injuries.

51.    Defendants' conduct injured Moore in three ways. Each is concrete, and each is independent of the others.

52.    *The taking.* Defendants copied the entire Work, stored the copy on servers they control, and displayed it to a mass audience of U.S. readers to draw traffic and sell advertising without a license, without payment, and without Moore's knowledge. A commercial publisher that wants to republish an artist's photograph licenses it and pays for the use; Defendants used the Work and paid nothing, and Moore lost the licensing fee it commanded. This is the invasion of an author's property right in his own work—the oldest harm copyright law redresses, and the direct analogue of copyright infringement.

53.    *The misattribution.* Defendants did more than take the Work; they put someone else's name on it. Publishing it under a false "© instagram" credit, and naming no one but the subject, told the audience the photograph was a platform's—generic, cleared, free for the taking—rather than the work of a working artist available to license. That substitution is its own economic injury, distinct from the unpaid license. Moore is a producer, actor, comedian, and visual artist whose livelihood depends on being identified with what he makes: the credit on a published work

16

is how audiences, collaborators, press, and prospective licensees connect the work to its author and find their way to him, and that recognition converts into commissions, licensing inquiries, and opportunity. By severing the Work from its author, Defendants pointed everyone who saw it—every reader, editor, and would-be licensee who might have sought Moore out—to a platform instead, suppressing the Work's licensing value and erasing the signal a true credit carries. Moore pleads this as harm to the market value of the Work and of his attribution-driven business, not as any freestanding right of attribution. The unpaid license measures what this one use was worth; the misattribution measures what Moore forfeits every time his work reaches others under someone else's name.

54.     *The concealment.* The same false credit hid the taking. Moore found Defendants' use of the Work only by chance—Ms. Sertich, the portrait's subject, happened on the Article and sent it to him. Nothing in the publication would have led him to it: having stripped the Work of any connection to its author, Defendants left a page with no trace pointing back to Moore, defeating the very means by which a creator finds an unauthorized use of his work. Had Ms. Sertich not happened upon the Article and thought to send it, Moore might never have learned of the taking at all. That is the concealment operating as designed—a use built not to be found, surfaced here only by a coincidence that the overwhelming majority of those Defendants take from will never enjoy. And the discovery, once made, put Moore to the burden and expense of investigating the use and enforcing his rights—costs Defendants' practice externalizes onto the creators it takes from.

## B.  Classwide Injuries.

55.     What Defendants did to Moore, they did to every Class member through the same templated process, producing the same injury. Every Class member, by definition, owns the copyright in a photograph that Defendants took from a social media source, re-hosted on their own

17

servers, and publicly displayed to U.S. readers without license or payment—so every member lost what Moore lost: the license revenue Defendants' use commanded and never paid. Members of the False-CMI Subclass lost more. Their works went out to a mass audience stamped with affirmatively false ownership information—"© instagram" and its variants—which both misrepresented each work to its own market and displaced the author-identifying information by which a creator detects an unauthorized use, polices it, and is found and paid. Members of the Registered Infringement Subclass suffered the unauthorized exploitation of their registered work.

56.    The harm a 17 U.S.C. § 1202 violation works has a settled traditional analogue: copyright infringement itself, which "provides an appropriate 'close historical or common-law analogue' to the harm caused by a DMCA violation." *The New York Times Co. v. Microsoft Corp.*, 777 F. Supp. 3d 283, 312 (S.D.N.Y. 2025).

57.    Because the analogue is a property injury, not a dignitary or reputational one, it does not depend on proof that any reader was misled or any sale lost. The injury to each member was complete when Defendants copied the member's work and stamped false ownership information onto it—whatever any reader did or did not conclude.

58.    The False-CMI Subclass suffered a second, equally traditional injury atop the first: publishing false statements about the ownership of another's goods to the buying public is the classic wrong of common-law unfair competition—exactly what Defendants did here.

59.    These injuries are embedded in the membership criteria themselves. No one belongs to any Subclass unless Defendants copied that person's own work, re-hosted it, and publicly displayed it to U.S. readers—the conduct that carries, in every instance, the invasion of property, the lost license revenue, the concealment, and, for the False-CMI Subclass, the public misattribution. There is no member who was not injured, because the injury defines the member.

## C.     Standing for Prospective Relief.

60.     The injuries are not finished in two respects. *First*, the harm already inflicted persists. The re-hosted copies Defendants made of Class members' works remain on their servers, and the works remain publicly displayed, so the unauthorized display, the false or absent credit, and the diverted licensing value alleged above continue, day after day, for as long as the copies stay up. *Second*, the machine that produced those copies is still running. Defendants continue to take photographs from individuals' social media accounts, re-host them, and publish them under platform credits, by the same templated process described above—adding new injured creators to the Class with every news cycle.

61.     Moore faces that practice himself going forward, and not as a remote possibility. He continues to create photographic works, whose subjects continue to post them to their own social media accounts, which is the very pool from which Defendants draw the images they copy, and the pool his Work has been taken from once already. Nothing distinguishes Moore's future work from the work Defendants have taken before; indeed, the practice is indifferent to who made the image, which is why it reaches creators like Moore who never posted their work themselves. The risk that Defendants will copy, re-host, and falsely credit Moore's work again is therefore concrete and substantial, making it precisely the prospective injury that the narrow declaratory and injunctive relief described in Section VI, and sought in the Prayer for Relief, is framed to stop.

## VI.     CLASS ACTION ALLEGATIONS

## A.    Plaintiff Brings This Action on Behalf of a Nationwide Class and Two Subclasses.

62.     Plaintiff brings this action under Federal Rule of Civil Procedure 23(b)(3) and (c)(4) and, to the limited extent set forth below, Rule 23(b)(2), individually and on behalf of the following nationwide Class:

All persons in the United States who own the copyright in one or more photographic works that they authored, and that Defendants, without license or authorization, reproduced from a social media source, re-hosted on Defendants' own servers, and published and displayed to readers in the United States on a Daily Mail platform during the Class Period, and who fall within at least one of the two Subclasses defined below.

63.    Two defined terms recur in this Complaint. "Daily Mail platform" means dailymail.com—the U.S. edition of the Daily Mail's website, operated by Defendant Mail Media—and any other Defendant-operated website on which the work at issue was published and served to readers in the U.S. "Social media source" means an account or post on Instagram, Facebook, X/Twitter, TikTok, Snapchat, GoFundMe, YouTube, or Reddit, as reflected in Defendants' records or on the face of the publication.

64.    The "Class Period" runs from three years before the filing of this Complaint to the date of the Court's class-certification order, or such later date as the Court may set. Every act of publication within that period is independently timely under the separate-accrual rule, without need of the discovery rule.

65.    The Class and the Subclasses do different work, and the distinction is deliberate. The Class is the vehicle for two things and no others—certification of the common issues under Rule 23(c)(4), and the limited declaratory and injunctive certification under Rule 23(b)(2) described below. Every claim for damages proceeds through a Subclass: false-CMI damages under 17 U.S.C. § 1202(a) through the False-CMI Subclass, and infringement damages under 17 U.S.C. §§ 106 and 501 through the Registered Infringement Subclass.

66.    Plaintiff seeks to represent two Subclasses, each defined by objective criteria drawn from the public face of Defendants' publications and from their own publishing systems and records:

*The False-CMI Subclass.* All Class members as to a work that, as Defendants published it on a Daily Mail platform, bore a copyright credit in the "© [name]"

20

form naming a social media platform—for example, "© instagram," "© facebook," "© twitter/X," or "© tiktok"—rather than naming the work's author or copyright owner, and where no caption or text accompanying the published photograph named the work's author or copyright owner. A credit consisting solely of a personal name, or solely of the handle or account name of the account that posted the work, does not place a work in this Subclass; nor does any credit identifying a wire service, stock agency, photo agency, or user-generated-content licensing agency (*see also* the exclusions set forth below).

***The Registered Infringement Subclass.*** All Class members who hold a United States copyright registration for the work at issue.

67.     The boundaries are drawn from objective sources. *First*, the conduct-side facts are visible on the face of Defendants' own publications: the published page shows the photograph, the "© [platform]" credit Defendants applied, and whether any author or owner is named—each ascertainable from the publication itself, as counsel's hand review and Exhibit 1 demonstrate. Defendants' content-management and publishing systems record the same facts in structured form—the social media source from which each image was taken (the URL or account logged at ingestion), its re-hosting on Defendants' servers, the credit applied, and, in their photo-desk, payment, accounting, and rights-clearance records, whether any license exists—and will confirm and complete the picture. *Second*, the member-side facts are equally objective—authorship and ownership of the photograph and, for the Registered Infringement Subclass, the effective date of a U.S. copyright registration—established through a standard claims process: a sworn declaration of authorship and ownership, possession of the original or native files, and, where applicable, control of the source account. Membership thus turns on facts, not legal conclusions—not on whether any credit is ultimately adjudged "false" CMI, or whether any member "satisfies" 17 U.S.C. § 412. The published page supplies the credit and the absence of any author's name, the member's own documents supply authorship and registration, and Defendants' records corroborate the source and the absence of any license.

21

**B.    Excluded Persons.**

68.    Excluded from the Class and from each Subclass are:

a)    Defendants and their officers, directors, members, affiliates, parents, subsidiaries, and employees;

b)    the judicial officers presiding over this action, their staff, and their immediate families;

c)    any person who, as reflected in Defendants' own records (photo-desk logs, payment and accounting records, agency invoices, or rights-clearance correspondence created on or before publication), granted Defendants a license, permission, or authorization to use the work at issue;

d)    as to a given work, any person whose work Defendants obtained from or through a licensed wire service, stock agency, photo agency, or user-generated-content licensing agency or intermediary (such as Jam Press, SWNS, or Kennedy News), and any person whose work at issue was created as a work made for hire;

e)    any person who has released the claims asserted in this Complaint; and

f)    any person whose claims against Defendants are subject to a binding arbitration agreement or forum-selection clause between that person and a Defendant governing those claims.

69.    Plaintiff reserves the right to amend the Class and Subclass definitions, including to add or refine exclusions, based on information learned in discovery.

### C.    Numerosity (Rule 23(a)(1)).

70.    The Class and each Subclass are so numerous that joinder of all members is impracticable. For the Class and the False-CMI Subclass, that conclusion rests on direct evidence. As alleged in Section IV above, counsel's hand review of Defendants' U.S. edition—covering a nine-day window in June 2026, a small fraction of the Class Period, and excluding stock, wire-service, and license-ambiguous aggregator credits—verified 107 articles in which Defendants published a photograph, often more than one, bearing a false "© [platform]" credit, taken from an individual's social media account, with no author named. Exhibit 1 collects a hand-verified set of those instances. Because that window is so small, a fraction of the Class Period, and the practice is templated and continuous, the Class and the False-CMI Subclass number at least in the thousands.

71.    The Registered Infringement Subclass is smaller. Ordinary creators almost never timely register their photographs, and that scarcity is the premise of this action's architecture. Still, the Registered Infringement Subclass numbers at least in the dozens and likely in the hundreds. Artists and photographers are recurrently among the creators whose photographs Defendants copy, and such professionals register in the ordinary course, including through group registrations of published photographs. The Copyright Office's registration records are public and searchable, and counsel will cross-match the creators whose works Defendants took against those records. The members of the Class and of each Subclass are dispersed across the U.S., each with a claim too modest to justify litigating alone against a transnational publisher. Joinder is impracticable whether the membership runs to the dozens, the hundreds, or the thousands.

72.    The members of the Class and of each Subclass are also identifiable. The public face of Defendants' publications supplies the conduct-side membership criteria for each work—

the photograph, the "© [platform]" credit, and the absence of any named author—and identifies the source account from which Defendants took it. Defendants' content-management and publishing systems record the same source, the re-hosting of the copy, and the applied credit in structured form, and will streamline identification and notice at scale. The authors are then identified from those leads, through class notice—including a social-media-targeted notice program directed at the recorded source accounts—and through ordinary claims administration, in which members identify themselves subject to verification. That the account that posted a photograph is not always its author—as Moore's own facts illustrate—is a matter of claimant identification at the administration stage, not an obstacle to defining the Class.

**D.    Commonality (Rule 23(a)(2)).**

73.    The claims of every Class and Subclass member turn on questions of law and fact common to them all—questions answerable for everyone at once, in a single stroke. They include, without limitation:

a)    whether Defendants maintained and applied a uniform, centralized practice of locating photographs on social media platforms, copying and re-hosting them on Defendants' own servers, and publishing them on Daily Mail platforms without a license from the copyright owner;

b)    whether, as part of that practice, Defendants systematically affixed "© [platform]" credits, such as "© instagram," to the photographs they copied, in place of the true author or owner's CMI;

c)    whether the "© [platform]" credit is CMI within the meaning of 17 U.S.C. § 1202(c);

24

d)    whether Defendants' affixation and publication of "© [platform]" credits is the provision or distribution of false CMI within the meaning of § 1202(a);

e)    whether Defendants acted with the knowledge and intent required by § 1202(a), including whether Defendants' documented pattern and practice supplies evidence of the requisite scienter common to the members;

f)    whether any social media platform's terms of service granted Defendants a license to copy, re-host, and commercially republish photographs posted to the platform by its users;

g)    whether the act of posting a photograph to a social media account by a person who is not the copyright owner can license Defendants' reproduction, re-hosting, and republication of that photograph;

h)    whether Defendants' conduct was willful; and

i)    whether per-violation statutory damages can be set by uniform, classwide criteria, given that the conduct, the scienter, and the use pattern are common to every violation.

74.    Each of these questions is answerable on common, classwide proof because each turns on Defendants' uniform course of conduct and their own systems and records, not on anything particular to one photograph or one creator. A single answer to each will resolve that issue for every member.

**E.    Typicality (Rule 23(a)(3)).**

75.    *False-CMI Subclass.* Moore's claim is typical of the False-CMI Subclass. Like every member, he owned a photograph that Defendants copied from a social media source, re-hosted on their servers, and published on a Daily Mail platform under a "© [platform]" credit—

here, "© instagram"—where the published page named only the photograph's subject and never the author or owner. His claim and theirs arise from the same uniform practice and rest on the same theory under 17 U.S.C. § 1202(a).

76. *Registered Infringement Subclass.* Moore's claim is typical here too. He holds a U.S. copyright registration for the Work, and Defendants copied, re-hosted, and published that work without a license. Variations in the circumstances of individual works do not defeat typicality because the central, disputed conduct—Defendants' uniform practice—holds the same place in Moore's claim that it holds in every member's.

### F.  Adequacy (Rule 23(a)(4)).

77. Moore will fairly and adequately protect the interests of the Class and Subclasses he represents. He is a member of each Subclass; he suffered the same injury from the same uniform practice as its members; and he has no interest antagonistic to theirs. Moore has retained counsel experienced in copyright, complex commercial, and class-action litigation who satisfy Rule 23(g) and will prosecute this action vigorously.

78. The one potential conflict the case presents is structural, and the structure already resolves it. The Second Circuit has recognized that registered and unregistered copyright claimants can have divergent interests in allocating a common recovery. *See In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 249-50 (2d Cir. 2011). This action forecloses that divergence by design. The two damages claims travel in separate channels: as alleged in Section VI.A above, the False-CMI Subclass recovers per-violation statutory damages under 17 U.S.C. § 1203 that require no registration and are drawn from no fund shared with, or capped against, the Registered Infringement Subclass's § 501 recovery. No representative must trade one constituency's interests against another's because the two recoveries do not compete. The *Literary*

*Works* problem arises at allocation, not at the pleading stage; should a genuine allocation question emerge—including in any classwide settlement—Moore will propose and consent to separate counsel for each Subclass, so that each Subclass is independently represented at any point of divergence.

79. *False-CMI Subclass.* Moore is an adequate representative of this Subclass, and a notably clean one. Defendants stamped a false "© instagram" credit on his Work—the affirmative provision of false CMI at the heart of the claim—and did so on a post that bore no CMI of its own, so his claim raises the false-CMI question without the complication of any removed or altered original credit. Proving Defendants' uniform "© [platform]" practice proves the corresponding element of every member's claim.

80. *Registered Infringement Subclass.* Moore is an adequate representative here too. He holds a U.S. copyright registration for the Work, and Defendants copied, re-hosted, and publicly displayed that registered work without a license. Like every member, he is entitled to recover actual damages and Defendants' profits under 17 U.S.C. § 504(b)—which § 412 does not bar—and, because he registered within three months of first publication, statutory damages and fees under §§ 504 and 505. A member's registration timing under § 412 bears on that member's remedies, not on membership in the Subclass.

81. The proposed representative is named in this Complaint as filed. Moore does not rely on adding a representative after filing to supply standing for, or adequate representation of, any Subclass.

**G. Class Standing.**

82. Moore has personally suffered a concrete injury caused by Defendants' conduct, and that conduct implicates the same set of concerns as the conduct that injured the absent members

of each Subclass he represents. That is what class standing requires, and Moore satisfies it for both Subclasses.

83.    *False-CMI Subclass.* Moore was injured when Defendants stamped the false "© instagram" credit on his Work and published it. His standing rests on the concrete harms alleged in Section V—the unauthorized copying and mass republication of his property, the license fee Defendants never paid, the false attribution that suppressed the Work's licensing value, and the credit that hid the taking from him—not on a bare statutory violation. Each of those harms has a settled common-law analogue, so each is concrete in the sense the law requires. And that conduct implicates the same set of concerns as the conduct that injured every other member of the False-CMI Subclass: Defendants' single, uniform practice of stamping "© [platform]" credits on photographs copied from social media. The proof Moore will marshal for his own claim—that Defendants maintained and applied that uniform false-crediting practice—is the proof of every member's claim. Moore accordingly has standing to assert the claims of the False-CMI Subclass.

84.    *Registered Infringement Subclass.* Moore was injured when Defendants copied, re-hosted, and published his registered work without a license, an invasion of property pleaded among the concrete harms in Section V. That conduct implicates the same set of concerns as the conduct that injured every member of the Registered Infringement Subclass: Defendants' uniform practice of taking and republishing social media photographs without authorization. Moore accordingly has standing to assert the Registered Infringement Subclass's claims.

**H.    Predominance and the Treatment of Individualized § 501 Defenses (Rule 23(b)(3)).**

85.    Common questions predominate because liability on the class claims turns on one thing common to every member: Defendants' uniform, centralized practice. Whether that practice exists and how it operates—the "publish first, pay only if caught" model, the standardized

stamping of "© [platform]" credits, the knowledge and intent its design reflects, and the legal questions of whether any platform's terms of service, or any non-owner's posting, could license Defendants' copying—are answered the same way for everyone, on common evidence—the uniform face of Defendants' publications, corroborated by their own systems and records. None turns on anything particular to a single photograph or a single creator. These common questions are not merely present; they are the heart of every claim and predominate over any individual issue.

86. The damages do not change that. The recovery is statutory, not a matter of individualized economic proof: for the False-CMI Subclass, $2,500 to $25,000 per violation under 17 U.S.C. § 1203(c)(3)(B); for the Registered Infringement Subclass, statutory damages within the range set by § 504(c). In each, the measure is fixed by statute and tied to the number of proven violations. The unit of violation is itself objective and uniform: each work Defendants published bearing false CMI is one violation of § 1202(a)—counted per work and per discrete act of publication, and not multiplied by page views, advertising impressions, or the repetition of the same image within a single article's gallery module. Plaintiff relies on no aggregate or econometric damages model, and the need for per-work statutory-damages determinations does not defeat predominance where, as here, the common liability questions so plainly predominate.

87. Fair use and license likewise enter the case the same way—once, uniformly—and create no individual inquiry that could overwhelm the common questions. Defendants' standard use is the unaltered, complete, non-transformative reproduction of an entire photograph, re-hosted on Defendants' own servers and published commercially to do the very illustrative work the photograph did at its source, in substitution for the market in which such photographs are licensed. Whether that single, templated use is fair has one common answer for every work used the same way. The license question resolves classwide too—whether a platform's terms of service, or a

29

poster's act of posting, licensed Defendants' re-hosting and commercial republication—and is treated at length below. Permission scenarios peculiar to individual works never reach the merits: the records-based exclusions remove from the Class, at the threshold, every person who granted Defendants a license and every work Defendants obtained from a licensed wire service, stock agency, or photo agency. And the § 1202(a) scienter elements rest on the uniform no-clearance design of the practice itself—Defendants stamp platform credits and omit authors without inquiry into who holds the rights—so they are established, or not, by the same proof for every member, regardless of whether some after-the-fact defense might have succeeded as to an outlier work.

88.     That leaves the § 501 infringement claim, which Plaintiff treats candidly. It carries defenses particular to individual works—ownership and chain of title, the existence and scope of any license as to a given work, fair use as applied to a given work, and registration timing under 17 U.S.C. § 412. Those work-specific defenses are precisely why the § 501 claim is confined to the Registered Infringement Subclass and why, as set forth in the issue-certification allegations below, Plaintiff seeks certification of the common questions under Rule 23(c)(4). They do not defeat predominance for three reasons.

89.     *First*, an affirmative defense that may play out differently across members does not make individual issues predominate. So long as a sufficient constellation of common issues binds the members together, variations in how a defense applies do not foreclose certification. The common questions identified above bind every member, and they predominate over the defenses that may differ among them.

90.     *Second*, the work-specific § 501 defenses are reserved to follow-on proceedings after the common questions are resolved. Resolving whether Defendants maintained the uniform practice, whether it violates § 1202, whether any platform's terms of service or any non-owner's

posting could license Defendants' copying, and whether Defendants acted willfully will advance every member's case without adjudicating any member's ownership, license, fair use, or registration timing. Plaintiff does not seek to deprive Defendants of the right to litigate any work-specific defense to any individual claim, and disclaims any procedure that would decide individual liability or individual defenses by formula.

91.     *Third*, even the license defense is common, and Defendants' own conduct dictates its answer. Whether a platform's terms of service, or any poster's act of posting, can license Defendants' re-hosting and commercial republication of a photograph is one legal question, answerable once for the Class. And as alleged in Section IV above, Defendants did not embed or in-line link to platform-hosted images; they copied each photograph, stored their own copy, and served it to the public themselves. Whatever rights a user's posting may grant the platform, and whatever a platform's own features may license for embedding, Defendants' server-copy republication falls outside any such theory, whoever posted the work.

## I.     Limited Declaratory and Injunctive Relief (Rule 23(b)(2)).

92.     Plaintiff seeks certification of the damages claims under Rule 23(b)(3) and Rule 23(c)(4), not Rule 23(b)(2). The equitable relief Plaintiff does seek is narrow and prohibitory: a declaration that Defendants' uniform practice of stamping "© [platform]" credits violates 17 U.S.C. § 1202, and an injunction restraining Defendants, going forward, from stamping false ownership or source credits on the photographs they copy and republish. That relief suits the Class as a whole. As alleged in Section V, Defendants continue to display the copied works and to run the practice that produced them, having thus acted—and absent an injunction continuing to act—on grounds that apply generally to the Class in the precise terms of Rule 23(b)(2).

J.　**Issue Certification (Rule 23(c)(4)).**

93.　Plaintiff seeks certification under Rule 23(c)(4) for classwide adjudication of the common issues identified in subparagraphs (a) through (h) of the Commonality allegations above: the existence and design of Defendants' uniform practice; the CMI character of the credits it stamps and their falsity; Defendants' knowledge and intent; the platform-license and non-owner-poster questions; and willfulness.

94.　A court may certify particular issues under Rule 23(c)(4) whether or not the claim as a whole would satisfy Rule 23(b)(3) predominance. These issues qualify. They are common to every member, provable by generalized evidence—the uniform face of Defendants' publications and their own systems and records—and, once answered, establish the core of liability under § 1202(a) and, for the Registered Infringement Subclass, §§ 106 and 501. What remains for individualized follow-on proceedings is narrow: the work-specific defenses peculiar to the § 501 claim (ownership, license, fair use, and § 412 timing) and the per-work election and calculation of statutory damages. Answering these issues once, rather than relitigating Defendants' uniform practice and scienter in thousands of separate suits, is the most efficient and fair way to adjudicate this controversy.

95.　Any residual individualized issues are manageable through the ordinary tools of Rule 23, including subclasses, bifurcation of liability and damages, a special master, and, if appropriate, decertification of particular issues. In any trial plan, Plaintiff will propose that the factfinder set a single per-violation amount, or a narrow band keyed to objective, records-based features of each publication, applied classwide because the considerations that drive the size of a per-violation award, including the nature and circumstances of the violation, the willfulness of the

32

conduct, and the profit motive behind it, are uniform here by design. Those tools, together with the statutory nature of the damages, confirm that this action is manageable as a class action.

### K.    Superiority (Rule 23(b)(3)).

96.    A class action is the superior method for fairly and efficiently adjudicating this controversy for two reasons. The first is judicial economy. Defendants' liability turns on a single, uniform practice and a single, documented course of scienter—facts that can and should be decided once for the entire Class, rather than thousands of times in thousands of separate suits, each retrying the same conduct, every retrial risking a different answer on the legality of identical acts.

97.    The second is that individual litigation is not realistically available to the ordinary creators who make up the Class—by Defendants' own design. Most Class members do not know their photographs were taken at all. Defendants copied the works without notice to anyone and published them under credits naming a platform rather than a person, so the taking stays hidden from nearly everyone, and looks cleared even to the rare creator who stumbles upon it. And even the creator who discovers the taking finds the individual claim impracticable. For such a creator, the 17 U.S.C. § 501 infringement claim is barely a claim. Section 411(a) bars suit until the Copyright Office acts on a registration application, which ordinary social media creators have almost never even filed when their work is taken, and § 412 then strips statutory damages and fees for any infringement that commenced before registration and outside the three-month window after first publication—as is virtually always the case here. Stripped of those remedies, the individual § 501 claim is worth only the modest license fee the creator might have charged, an amount dwarfed by the cost of registering, retaining counsel, and litigating against a transnational media enterprise.

98.    The § 1202(a) claim is no more viable alone because the violation is built not to be found and is expensive to prove once it is. The false "© [platform]" credit conceals the very taking it accomplishes: it makes the use look licensed, so that even a creator who happens on his own photograph beneath a "© instagram" legend is invited to assume someone, somewhere, cleared it—and the overwhelming majority of members never encounter the use at all. Detecting the practice at scale takes exactly the systematic, resource-intensive investigation that no individual creator pursuing a single photograph would or could mount—the investigation counsel undertook here, described in Section IV above. Fee-shifting does not close the gap: § 1203(b)(5) commits fees to the court's discretion, and the prospect of a discretionary fee award on a one-photograph claim is unlikely to finance litigation against a transnational publisher. And against the modest per-work recovery stands everything each individual action would have to prove from scratch— the practice, the re-hosting, the absence of any license, and Defendants' institutional scienter—the same proof, against the same Defendants, suit after suit, with the live risk that different factfinders answer the same questions differently. Class treatment answers them once, for everyone.

99.    Plaintiff confronts directly the objection that, "[g]enerally speaking, copyright claims are poor candidates for class-action treatment." *Football Ass'n Premier League Ltd. v. YouTube, Inc.*, 297 F.R.D. 64, 65 (S.D.N.Y. 2013). That is a district-court statement the Second Circuit has never adopted, and it came from a very different case: a proposed worldwide class of copyright owners of every description, suing a user-upload platform over a heterogeneous repertoire shot through with individualized licensing. Its superiority premise—that "the availability of statutory damages is designed to give litigation value to each individual case"—not only fails to hold here but inverts: § 412 strips ordinary unregistered creators of statutory damages on which that premise depends, leaving exactly the small, uneconomic recoveries the class device

exists to aggregate. And where the claim is to a single defendant's uniform course of conduct, provable from its own systems and records, courts certify copyright classes like any other. *See In re Napster, Inc. Copyright Litig.*, No. C 04-1671 MHP, 2005 WL 1287611, at *7 (N.D. Cal. June 1, 2005) (certifying a copyright class notwithstanding work-by-work ownership and registration questions because "the claims of every member of the class are uniformly premised upon" the same conduct—a "shared factual predicate" that "gives rise to a host of common legal issues"); *Sykes v. Mel S. Harris & Associates LLC*, 780 F.3d 70, 85 (2d Cir. 2015) (affirming Rule 23(b)(3) certification of claims arising from a defendant's "unitary course of conduct" provable by common evidence); *Bartz v. Anthropic PBC,* 791 F. Supp. 3d 1038, 1054 (N.D. Cal. 2025) (certifying, over opposition, a class of copyright owners defined by the defendant's own acquisition records, with registration timing built into the class definition: "This is the classic case for certification."). This case is of that kind. A class action is the superior method of adjudicating the claims of the Class and Subclasses.

## VII.    CLAIMS FOR RELIEF

### COUNT I: Provision and Distribution of False Copyright-Management Information
### 17 U.S.C. § 1202(a)

#### (*Moore, on behalf of himself and the False-CMI Subclass,*
#### *against all Defendants*)

100.    Plaintiff repeats and incorporates by reference each preceding paragraph as though fully set forth herein.

101.    This Count is asserted by Moore, individually and as representative of the False-CMI Subclass.

102.    The credit "© instagram" that Defendants stamped on and published with their copy of the Work is CMI within the meaning of 17 U.S.C. § 1202(c), as are the "© [platform]" credits

enumerated in the False-CMI Subclass definition that Defendants stamped on the Subclass members' works. Each is a copyright notice, and information purporting to identify the copyright owner, conveyed by Defendants in connection with a copy of the work. CMI includes the name of, and identifying information about, the author or owner, whether carried in a caption or stamped onto the image itself; it need not be embedded in the image file because information conveyed in connection with the copy qualifies. Here the conveyance is as direct as it gets: Defendants rendered the credit onto the face of the image and published it with every copy.

103.    That credit is false. Instagram does not own and has never owned the copyright in the Work; Moore is its sole author and owner. The falsity is legible in Defendants' own credit grammar: on the same pages, in the same visual furniture, Defendants render genuine credits in the identical "© [rights-holder]" form—for staff photography and for licensed agency images from Getty, the Associated Press, and the like—so, in Defendants' own system, the © field is where ownership is asserted; and "© instagram" in that field asserts an ownership interest Instagram does not hold. Attributing a work to an owner other than its true author or owner is the provision of false CMI, and the "© [platform]" credits on the Subclass members' works are false in the same way: each ascribes the copyright in, or source of, the work to a social media platform that owns nothing, rather than to the true author or owner. Nor does the falsity depend on the author's name being absent: a credit line that retains the true author's name while inserting a non-owner's can itself convey false CMI, whatever the publisher later claims it meant. The statute thus reaches further than this False-CMI Subclass is drawn—the Subclass is confined to the cleanest case, the author named nowhere and the false platform credit standing alone, and here that limit is met: Defendants named Moore nowhere, not in the credit, not in the caption, not anywhere on the page.

104.    Defendants provided and distributed this false CMI by publishing the copied works bearing the false "© [platform]" credits on the Daily Mail platforms and, to the extent content produced abroad is supplied to the U.S. through Defendants' shared systems for publication on dailymail.com, Defendants imported it for distribution. 17 U.S.C. § 1202(a)(1)–(2).

105.    Defendants acted with both states of mind § 1202(a) requires: actual knowledge that the CMI at issue is false, and the intent to induce, enable, facilitate, or conceal infringement.

106.    *Actual knowledge of falsity.* The "© [platform]" credit is no glitch or artifact of migration; it is a templated step in Defendants' production process: a picture editor selects the credit in the credit field of Defendants' content-management system, and Defendants' production process burns it into the pixels of the published image. Defendants know what the © form asserts because they use the identical "© [rights-holder]" form on the same pages to credit genuine rights-holders—staff photographers and licensed agencies like Getty and the Associated Press. They know a platform is not such a rights-holder because every major platform's terms of service, Instagram's included, provide that users keep ownership of what they post: the platform takes a license from the user; it neither acquires nor claims ownership. Defendants know the conduct is actionable because they have been told so in court—federal copyright suits over their republication of photographs since at least 2010, and § 1202 claims over their treatment of credits since at least 2016, when a court in this District denied ANL's motion to dismiss § 1202 claims arising from Daily Mail Online's publication of a creator's content with the creator's identifying logo removed. *See Devocean Jewelry LLC v. Associated Newspapers Limited*, No. 16-CV-2150 (KMW), 2016 WL 6135662, at *2 (S.D.N.Y. Oct. 19, 2016). They continued the practice anyway. And the selectivity of the credit treatment is itself proof of knowledge: where a corporate licensor with the resources to sue holds the rights, Defendants preserve and publish that licensor's credit; where the

37

photograph came from an individual's social media account, the author's name vanishes and a platform's name, behind a © symbol, takes its place. This is not a hosting platform stamping a uniform watermark on its own inventory; it is a publisher affirmatively branding, as an editorial act, photographs it copies from someone else. *See* Exhibit 1.

107.    *Intent to induce, enable, facilitate, or conceal infringement.* Defendants provided and distributed the false "© [platform]" credits with the intent to conceal—and so to enable and facilitate—infringement, including their own unauthorized reproduction, re-hosting, and public display of the Work and the False-CMI Subclass members' works. The concealment works in four steps. *First*, in the grammar of a news page, a "© [name]" credit signals a cleared, licensed use— the same visual furniture Defendants use for Getty and Associated Press images on the same pages—making the copied photograph look licensed to readers, advertisers, and rights-holders alike. *Second*, omitting the author's name defeats the tools working photographers actually use to find unauthorized uses of their work—searches for their own names and credit lines, and alert services keyed to them—so the taking goes undetected and the demand never comes. *Third*, because the credit is burned into the image's pixels and Defendants publish no machine-readable credit field, the published page carries no trail leading from the photograph back to its author. *Fourth*, that concealment is what makes "publish first, pay only if caught" profitable. The fewer creators who catch the taking, the fewer the demands, and the lower the only licensing cost the model recognizes. The intent therefore follows from the design of the practice itself.

108.    Defendants' provision and distribution of false CMI was knowing and willful, as part of the systematic, standardized practice alleged above.

109.    Moore and each member of the False-CMI Subclass were injured as alleged in Section V, including through the unauthorized commercial exploitation and public display of their

38

works, lost license revenue and attribution value, and the impairment of their ability to detect and police the use of their works. Each work Defendants published bearing a false "© [platform]" credit is a violation of 17 U.S.C. § 1202(a), counted per work and per publication act. Moore and the False-CMI Subclass are entitled to recover, at their election, statutory damages of not less than $2,500 and not more than $25,000 per violation under § 1203(c)(3)(B), or actual damages and Defendants' profits attributable to the violation under § 1203(c)(2), together with costs and reasonable attorneys' fees under § 1203(b)(4)–(5) and injunctive relief under § 1203(b)(1). Because the remedies under § 1203 are not awards "as provided by sections 504 and 505," they are not barred by § 412, and they require no copyright registration.

<u>**COUNT II: Copyright Infringement**</u>
<u>**17 U.S.C. §§ 106, 501**</u>

(***Moore, on behalf of himself and the Registered Infringement Subclass,***
***against all Defendants***)

110.    Plaintiff repeats and incorporates by reference each preceding paragraph as though fully set forth herein.

111.    This Count is asserted by Moore, individually and as representative of the Registered Infringement Subclass.

112.    Moore owns a valid copyright in the Work, which is original, fixed in a tangible medium of expression, and copyrightable subject matter under 17 U.S.C. § 102.

113.    Each member of the Registered Infringement Subclass owns a valid copyright in the work or works at issue.

114.    Moore registered the Work with the United States Copyright Office, Registration No. VA0002489101, effective December 31, 2025, satisfying the registration precondition to suit under 17 U.S.C. § 411(a). As reflected in the registration, the Work was first published on

December 15, 2025. Each member of the Registered Infringement Subclass likewise holds a U.S. copyright registration for the work at issue, satisfying the same precondition.

115.     Defendants infringed the exclusive rights of Moore and the Registered Infringement Subclass members under 17 U.S.C. § 106—the rights of reproduction, distribution, and public display—by copying each work, storing and re-hosting the copy on Defendants' own servers, and distributing and publicly displaying each work on the Daily Mail platforms, in every case without license or authorization. That conduct is actionable without reaching any debate over the so-called "server test": Defendants did not embed or in-line link to a platform-hosted image; they made their own copies, stored them on systems they own or control, and served those copies to the public, so the reproduction, the distribution, and the display each occurred on their own infrastructure. In any event, courts in this District have rejected the server rule. *See Goldman v. Breitbart News Network, LLC*, 302 F. Supp. 3d 585, 590 (S.D.N.Y. 2018); *Nicklen v. Sinclair Broad. Grp., Inc.*, 551 F. Supp. 3d 188, 194-95 (S.D.N.Y. 2021).

116.     Defendants had neither license nor justification. No act of any person who posted the work, and no platform's terms of service, gave Defendants any license to reproduce, re-host, distribute, or publicly display it. Nothing in Instagram's terms grants even an embedder a license to use publicly posted content—and Defendants did not embed; they copied.

117.     Nor was the use fair. Defendants copied each work in its entirety; used each photograph for the very purpose for which it was made—to depict its subject; did so commercially to draw readers to advertising-supported pages; added no commentary, criticism, or reporting about the photograph itself; and supplanted the work's licensing market with each unlicensed copy. As this Court has held, "[s]tealing a copyrighted photograph to illustrate a news article, without adding new understanding or meaning to the work, does not transform its purpose—regardless of

whether that photograph was created for commercial or personal use." *Otto v. Hearst Commc'ns, Inc.*, 345 F. Supp. 3d 412, 419 (S.D.N.Y. 2018).

118.    Defendants' infringement was willful. Defendants acted with actual awareness of their infringing activity or, at the least, with reckless disregard for and willful blindness to the copyright holders' rights. The scienter is legible in the practice's design: Defendants—sophisticated global publishers with professional editorial and legal staffs—run an image pipeline, deliberate in design and automatic in application, that takes photographs from individuals' social media accounts without inquiry into authorship or license, burns false credits over them, as exemplified in Exhibit 1, and pays, if at all, only when a creator catches the use and demands payment. A publisher running that pipeline knew, or should have known, that the photographs it took were not the platforms' to give. Constructive knowledge suffices; malice is not required. And Defendants were on notice: as alleged in Section IV above, they have faced copyright and § 1202 litigation over these very practices, and continued them. That recurring pattern is itself evidence of willful blindness.

119.    Because Moore registered the Work within three months of its first publication, 17 U.S.C. § 412(2) entitles him to statutory damages and attorneys' fees—including enhanced statutory damages for willful infringement under § 504(c)—for Defendants' infringement of the Work, which commenced on or about December 24, 2025 and continued via Defendants' ongoing reproduction, re-hosting, distribution, and public display, through at least March 17, 2026, together with actual damages and Defendants' profits under § 504(b) and injunctive relief under § 502.

120.    Each member of the Registered Infringement Subclass holds a U.S. copyright registration for the work at issue and may recover actual damages and Defendants' profits under 17 U.S.C. § 504(b), and injunctive relief under § 502—relief § 412 does not limit. Members whose

registrations satisfy § 412's timing—because registration took effect before Defendants' infringement of the work commenced, or within three months of the work's first publication—may further recover, at their election, statutory damages under § 504(c), including enhanced damages for willful infringement, and fees and costs under § 505. As set forth above, whether a given member's registration satisfies § 412 is an individualized question reserved to follow-on proceedings; it bears on neither membership in the Subclass nor the common questions of Defendants' liability. A member whose work also places the member in the False-CMI Subclass may recover on this Count and under § 1203 for the same work—though never twice for the same harm—because the Copyright Act and the DMCA protect distinct interests.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Class and the Subclasses, respectfully requests that the Court enter judgment in his favor and against Defendants, jointly and severally, and grant the following relief:

1. An order certifying this action as a class action under Federal Rule of Civil Procedure 23(b)(3) and 23(c)(4) and, to the limited extent set forth in the Class Action Allegations above, Rule 23(b)(2); certifying the Class and the two Subclasses defined above—the False-CMI Subclass and the Registered Infringement Subclass; appointing Moore as representative of each Subclass; appointing the undersigned as class counsel under Rule 23(g); and, if and to the extent any allocation among Subclasses arises, appointing separate counsel for each Subclass;

2. In the alternative to, or in conjunction with, subparagraph 1, an order under Federal Rule of Civil Procedure 23(c)(4) certifying for class treatment the common issues designated for issue certification in the Class Action Allegations above, including (i) whether Defendants maintained and applied a uniform, centralized practice of copying photographs from social media

42

sources, re-hosting them on Defendants' servers, and publishing them on Daily Mail platforms without a license while crediting them to a platform rather than to the author; (ii) whether any social media platform's terms of service, or any act of posting by a person who is not the copyright owner, licensed Defendants' reproduction, re-hosting, and commercial republication of the works; and (iii) whether Defendants' conduct was willful;

3. A declaratory judgment that Defendants violated 17 U.S.C. § 1202(a) by providing and distributing false copyright-management information; that Defendants infringed the copyrights of the Registered Infringement Subclass in violation of 17 U.S.C. §§ 106 and 501; and that Defendants' conduct was willful;

4. A permanent injunction, under 17 U.S.C. §§ 502 and 1203(b)(1), restraining Defendants from stamping false "© [platform]" or other false copyright-notice or rights-holder credits on photographs they copy from social media sources and republish;

5. As to Count I, an award to Moore and to the members of the False-CMI Subclass of statutory damages under 17 U.S.C. § 1203(c)(3)(B) of not less than $2,500 and not more than $25,000 for each violation of 17 U.S.C. § 1202—each violation counted, as alleged in the Class Action Allegations above, per work and per publication act—or, at the election of each such Subclass member, actual damages and Defendants' profits attributable to the violation under 17 U.S.C. § 1203(c)(2);

6. As to Count II, an award to Moore and to the members of the Registered Infringement Subclass of actual damages and Defendants' profits attributable to the infringement under 17 U.S.C. § 504(b), and an award of statutory damages under 17 U.S.C. § 504(c), including the maximum enhanced statutory damages for willful infringement, to Moore and to those

43

members of the Registered Infringement Subclass whose registrations satisfy § 412, at the election of each such Subclass member;

7.    An award of reasonable attorneys' fees and full costs to Moore and the False-CMI Subclass on Count I under 17 U.S.C. § 1203(b)(4)–(5), and to Moore and the Registered Infringement Subclass on Count II under 17 U.S.C. § 505;

8.    An award of pre-judgment and post-judgment interest at the maximum rate permitted by law;

9.    An order providing for notice to the Class and Subclasses and for the administration of any class recovery; and

10.    Such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: June 30, 2026                     Respectfully submitted,

*/s/ Jaymie Parkkinen*
Jaymie Parkkinen (*pro hac vice application forthcoming*)

PARKKINEN PC
808 Wilshire Blvd., Suite 200-255
Santa Monica, California 90401
Tel:    (323) 919-3590
Email: jp@prkknn.com

*Counsel for Plaintiff and the Proposed Class*